UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF MISSISSIPPI
NORTHERN DIVISION

LEO JOHN HOLSTINE                                                      PLAINTIFF

v.                                                    CIVIL ACTION NO. 3:14cv58-DPJ-FKB

NATIONAL RAILROAD PASSENGER                                          DEFENDANTS
CORPORATION d/b/a AMTRAK and
ILLINOIS CENTRAL RAILROAD
COMPANY

ORDER

This case is before the Court on the following motions filed by Defendants National

Railroad Passenger Corporation d/b/a Amtrak and Illinois Central Railroad Company:  a Motion

for Summary Judgment [86]; a *Daubert* Motion to Exclude Testimony of Plaintiff's Proffered

Expert Keith Ferguson [90]; and a *Daubert* Motion to Exclude the Testimony of Plaintiff's

Proffered Expert Jim Scott [92].  As set forth below, the Motion for Summary Judgment [86] is

granted in part.  The Court defers ruling on the *Daubert* motions at this time.

I.      Facts[1] and Procedural History

On January 28, 2012, Herbert Cole pulled his pickup truck onto a railroad crossing in

Yazoo City, Mississippi, straddled the tracks with his tires, and sat motionless inside his cab for

more than 12 seconds as a southbound Amtrak locomotive approached, blaring its horn.  The

track leading to the crossing was long and straight, and the visibility was excellent.  Yet Cole

never moved and was killed seconds later.  Plaintiff Leo Holstine was a passenger on the train

and claims that he was injured during the collision.

---

[1]Additional facts will be discussed later in this order as pertinent to the analysis.

These events were captured on a video camera mounted on the Amtrak locomotive.[2]  In one of the final pre-crash frames, Cole is seen sitting in his truck between the fully deployed crossing gates.  The parties do not dispute that Cole's left-rear brake light is illuminated. Notably, the gate in front of Cole would not have prevented him from pulling off the tracks had he wanted—or been able—to do so:



Allen Decl. [86-8] at Ex. BA-1.

_____

[2]Holstine suggests that the video could have been manipulated or changed.  Pl.'s Mem. [117] at 18–19.  But Holstine has no evidence to support this suggestion, and the undisputed record evidence establishes its authenticity.  *See* Hudson Decl. [86-25]; Warren Decl. [121-5].

In addition to the video, the equipment at the crossing had an event data recorder.  The data shows that the crossing lights had been flashing for 27 seconds, the crossing bells had been sounding for 27 seconds, and the crossing gates had been in the horizontal position for 15 seconds before the train reached the crossing.  Dunn Dep. [86-12] at 80–90.  Holstine disputes this data.

Though Cole's estate initially sued, that case was voluntarily dismissed, as were Holstine's claims against Yazoo County, Mississippi, and Canadian National Railway Company.  That leaves only Holstine's negligence claims against Amtrak and Illinois Central.  According to Holstine, Defendants breached the standard of care in the following respects:  "the lack of a functioning electrical or mechanical device or the lowering of a crossgate which would alert drivers to the presence of an approaching train," First Am. Compl. [1-1] ¶ 9; the fact that "no horn or whistle was sounded pursuant to applicable law to signal the train's approach to the subject intersection," *id.* ¶ 10; the failure "to repeatedly sound [the] horn in advance of approaching the crossing," *id.* ¶ 16; the failure "to operate the train at a safe speed, specifically through railroad crossings," *id.* ¶ 17; a failure "to properly maintain necessary warning signs and markings at intersections where vehicles would cross a railroad," *id.* ¶ 19; the "[f]ailure to stop prior to colliding with Cole's vehicle," *id.* ¶ 20(c); a "[f]ailure to properly supervise and train its employees" and "to properly instruct its employees in the operation of a locomotive," *id.* ¶¶ 20(f) & (g); and a failure to provide adequate "warnings of approaching locomotives" and "roadway markings/controls to prevent automotive/locomotive collisions," *id.* ¶¶ 20(I) & (k).

Following the close of discovery, Defendants filed their motion for summary judgment and *Daubert* motions.  The matters raised have been fully briefed, and the Court has personal and subject-matter jurisdiction and is prepared to rule.

II.     Standard

Summary judgment is warranted under Rule 56(a) of the Federal Rules of Civil Procedure when evidence reveals no genuine dispute regarding any material fact and that the moving party is entitled to judgment as a matter of law.  The rule "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  *Id.* at 323.  The nonmoving party must then "go beyond the pleadings" and "designate 'specific facts showing that there is a genuine issue for trial.'"  *Id.* at 324.  Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial.  *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc) (per curiam); *SEC v. Recile*, 10 F.3d 1093, 1097 (5th Cir. 1993) (per curiam).

Finally, "the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in its favor.  In reviewing the evidence, the court must therefore refrain from making credibility determinations or weighing the evidence."  *E.E.O.C. v.*

4

*WC & M Enters., Inc.*, 496 F.3d 393, 397 (5th Cir. 2007) (internal quotation marks and citations omitted).

III.     Analysis

Defendants assert that a number of Holstine's claims—for example, the claim that the train "exceed[ed] the regulated speed for trains through cities and towns per Miss. Code Ann. § 77-9-237"—are preempted by federal law.  First Am. Compl. [1-1] ¶ 18; *see* Defs.' Mem. [87] at 9.  Holstine appears to concede that some of his state-law claims—including the excessive-speed claim—are preempted.  As such, he focuses his response on four claims he says are not preempted:  (1) "claims regarding the Defendants' failure to slow and stop" to avoid the collision, Pl.'s Mem. [117] at 6; (2) "claims regarding defective warnings and signals," *id.* at 13; (3) "claims regarding the misuse of the horn," *id.* at 22; and (4) "claims regarding negligent training," *id.* at 26.  The Court will address each claim in turn.

A.     Failure to Slow and Stop to Avoid Collision

Holstine faults the train's engineer, Benton Allen, with failing to slow then stop the train prior to the collision with Cole's truck.  Under Mississippi law, "train crews have a right to assume that a vehicle will heed warning signals and the visual approach of a train and that the driver will stop. . . .  Train crews do not have a duty to stop or slow the train until it becomes apparent that a driver will not stop."  *Ill. Cent. Gulf R.R. Co. v. Travis*, 106 So. 3d 320, 330 (Miss. 2012).  Said differently, the train engineer has a duty "to slacken his speed [when] circumstances arise which appear to his mind, or should bring to his mind, the reflection that the person . . . will probably not seek his safety in due time."  *New Orleans Great N. R. Co. v. Branton*, 146 So. 870, 872 (Miss. 1933).

5

In this case, the parties generally agree that Cole's truck would have been visible to Allen for more than 12 seconds. In addition, the train was equipped with an event data recorder similar to an airplane's "black box." That device's data indicates that the train was traveling approximately 77 miles per hour as it approached the crossing and that the emergency brake was engaged approximately 502 feet (or five seconds) before the collision. Peterson Decl. [86-9] ¶ 9B. Allen testified about the seconds between seeing the truck and placing the train in emergency-brake mode:

> A. . . . And as I got to the—close to the yard office, I could seen [sic] this pickup truck sitting on the track and, you know, hoping that he would move on along. And when I got closer to the crossing, he—it was obvious he didn't, he wasn't. And so I put the train in emergency.
>
> Q. All right. Why did you feel like he—why did you think he might go ahead and move along?
>
> A. Well, that's usually what people do. They'll—they'll—either—you know, they'll either run around gates or they'll pull up and stop and look to—"Oh, is that really a train coming?" You know, I don't know what they think. But they'll sit there and—and then they'll move along. I'm not saying they wait till just the last second, you know.
>
> Q. Yeah.
>
> A. And—but when it was apparent that this guy wasn't going to go, in my opinion, I—that's when I applied the emergency brake.

Allen Dep. Vol. II [86-1] at 33–34.

Allen had no duty to slow or stop the train the moment he first saw Cole's truck on the tracks. *Travis*, 106 So. 3d at 330. But he did have that obligation once it became "apparent" that Cole would not move. *Id.* So the question is whether Allen should have concluded earlier than 5 seconds before impact that Cole would not seek safety. The Court will not answer that question

as a matter of law; a jury should decide "whether the train engineer's efforts to avoid the collision were sufficient." *Ill. Cent. R.R. Co. v. Cryogenic Transp., Inc.*, 901 F. Supp. 2d 790, 804 (S.D. Miss. 2012).  Summary judgment is denied as to this claim.

B.     Defective Warnings, Signals, and Horn

Holstine concedes that "[a]ny claim raising the issue of inadequacy of . . . warning devices installed with the use of federal funds would be preempted."  Pl.'s Mem. [117] at 13.  He also concedes that lights and gates were installed at the crossing in 1995 using federal funds.  *See id.* at 14; Defs.' Mem. [87] at 13 (citing Stubbs Decl. [86-7]).  Holstine nevertheless asserts that he may pursue a claim based on the adequacy of the warnings and signals at the crossing for two reasons:  (1) the devices or some part thereof could have been replaced "subsequent to the initial installation," Pl.'s Mem. [117] at 14; and (2) Defendants failed to properly maintain the devices post-installation, raising a "reasonable doubt[]" as to "the actual working order of the devices on the date of the collision," *id.* at 15.

1.     Whether Equipment Was Replaced

There is no credible evidence suggesting that any of the warning devices or their parts were replaced after the initial installation or that they were replaced without federal funds.  Holstine's contrary suppositions are not sufficient to avoid summary judgment.  *TIG Ins. Co.*, 276 F.3d at 759.  Moreover, even if there were evidence that some part had been replaced, Holstine has not provided the Court with any authority suggesting that preemption as to the adequacy of the warning system would be lost in that event.  The case law appears to suggest otherwise.  *See Hesling v. CSX Transp., Inc.*, 396 F.3d 632, 645 (5th Cir. 2005) ("Once federal funds, and concomitantly federal approval, are given for a crossing's warning system the

financing of the improvement project and its direction and control are removed from the railroad, and claims against the railroad relating to the adequacy of the warnings are preempted." (quoting *Armijo v. Atchison, Topeka & Santa Fe Ry. Co.*, 87 F.3d 1188, 1190 (10th Cir. 1996)) (internal quotation marks omitted)); *Bock v. St. Louis Sw. Ry. Co.*, 181 F.3d 920, 923 (8th Cir. 1999) ("Preemption is not a water spigot that is turned on and off simply because a later decision is made to upgrade a crossing. . . .  [O]nce a federally funded warning device is installed and operational[,] . . . preemption occurs.").

2.      Maintenance of Warning System

On the second point, Holstine's claim is not that the warning system was inadequate but that the signals were not functioning properly when the collision occurred due to Defendants' alleged failure to properly maintain the equipment.  The parties seem to agree that these claims would not be preempted, so they address them on the merits.

According to Holstine, the crossing gates, warning bells, and warning lights did not operate properly and these failures caused the collision.  He offers the following supporting evidence:  (1) a television news report containing video taken at the crossing approximately two days after the collision; (2) the observations made by Holstine's expert, Keith Ferguson, who inspected the equipment at the crossing on December 2, 2014—nearly three years after the collision; (3) Defendants' reports indicating "abnormal" test results on the day of the collision; and (4) the testimony of Steven Gambrell, who claims to have witnessed the collision. Defendants refute this evidence and further argue that Holstine cannot establish that any malfunctioning equipment proximately caused the collision.

a.      News Video

Holstine has submitted footage from a local news broadcast that aired two days after the accident.  In the video, the reporter explains that she and her camera crew "stayed by the crossing Monday night [two days after the collision] to see if the bars would go down.  They did, just about 6 seconds before the train roared by."  News Video [118].  According to Holstine, this video demonstrates that the crossing gates malfunctioned on January 28, 2012, violating federal regulations.

Even ignoring the hearsay issues, the broadcast footage fails to show Defendants violated any federal regulation.  As Defendants point out, when the footage of the approaching train commences, "the crossing lights are already flashing, the bell is sounding[,] and the gates are on their way down.  Critically, the video does not show when these warning devices <u>started</u> to operate."  *Id.*  The applicable regulation requires a crossing warning system to provide no less than "20 seconds warning time for the normal operation of through trains before the grade crossing is occupied by rail traffic."  49 C.F.R. § 234.225.  The news footage does not speak to this issue.  It does, however, show that the crossing gates were fully horizontal six seconds before the train arrived, which is one second more than required under 49 C.F.R. § 234.223 (stating that crossing gates "shall assume the horizontal position at least five seconds before the arrival of any normal train movement through the crossing").  Simply stated, the news footage fails to raise a question of fact as to whether the gates, lights, or bells were properly working at the time of the collision on January 28, 2012.[3]

---

[3]It is also questionable whether the video shows a southbound train, leaving doubt whether the conditions were "substantially similar" to those in existence at the time of the accident.  *Williams v. Briggs Co.*, 62 F.3d 703, 707 (5th Cir. 1995) (quoting *Barnes v. Gen.*

b.      Ferguson's Testimony

Holstine relies on Ferguson's testimony that the crossing equipment failed to properly function on January 28, 2012.  Specifically, Ferguson observed two southbound trains proceed through the crossing on December 2, 2014, and the crossing equipment provided only 12–13 seconds of warning time instead of the 20 seconds required by federal law.  Ferguson Report [90-2] at 2.  Ferguson was also unable to locate circuit plans and monthly inspection reports at the crossing as federal regulations mandate.  Defendants have filed a separate motion to exclude the testimony of Keith Ferguson, and the Court agrees with Defendants that the testimony is irrelevant and inadmissible.

For post-accident observations or tests to be admissible, the proponent of the evidence must demonstrate that the subject equipment and conditions were "substantially similar" to those in existence at the time of the accident.  *Williams*, 62 F.3d at 707.  Holstine has not met this burden.  In fact, the undisputed evidence shows that the crossing control system for the crossing was replaced on or about April 15, 2013—between the date of the accident and the date Ferguson observed the crossing.  Dunn Decl. [90-3] ¶ 6.  Ferguson's testimony about the inadequate warnings he observed on December 2, 2014, is not admissible.

As to his testimony that the plans and reports were not present at the crossing on December 2, 2014, there is no evidence that those documents were also missing nearly three years earlier when the accident happened.  Moreover, Holstine has not explained how a failure to keep the records in the designated location proximately caused the collision and Holstine's

---

*Motors Corp.*, 547 F.2d 275, 277 (5th Cir. 1977)).  Northbound trains would employ different triggers.  *Cf.* Dunn Dep. [86-12] at 79–80 (explaining that a motion sensor recognizes an approaching train, which triggers the crossing warnings).

alleged injuries.  Ferguson's testimony does not create a fact issue as to whether the warning equipment at the crossing was functioning properly at the time of the accident.

c.     Abnormal Test Results

Holstine also offers Trey Dunn's Rule 30(b)(6) testimony for Illinois Central, in which he addressed a series of "abnormal" test results at the crossing, including some from the day of the collision and the following day.  Pl.'s Mem. [117] at 20.  At the time of his October 29, 2014 deposition, Dunn was unable to explain the reason some results were recorded as "abnormal," but subsequent to his deposition, he claims to have discovered a coding error in the software that erroneously caused the "abnormal" test results upon which Holstine relied.  Dunn Errata Sheet [121-4].  Defendants attached a revised report to Dunn's Errata Sheet, which corrected the coding error and shows no "abnormal" test results on the crossing equipment.  *Id.*  Defendants offered to let Holstine resume Dunn's deposition in light of the changes in his testimony, but Holstine apparently declined.

Federal Rule of Civil Procedure 30(e) provides a deponent 30 days from notification that his deposition transcript is available to review the transcript and, "if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them."  *Walker v. George Koch Sons, Inc.*, No. 2:07cv274-KS-MTP, 2008 WL 4371372, at *1 (S.D. Miss. Sept. 18, 2008) (internal quotation marks omitted).  "[T]he majority view 'accords a plain meaning approach or literal interpretation to Rule 30 and, consequently, allows any change in form or substance regardless of whether convincing explanations support the change.'"  *Id.* at *2 (quoting *Betts v. Gen. Motors Corp.*, No. 3:04cv169-M-A, 2008 WL 2789524, at *2 (N.D. Miss. July 16, 2008)).  The Fifth Circuit has stated that it "do[es] not necessarily disagree" that a deponent can

11

make substantive changes to his deposition.  *Gonzalez v. Fresenius Med. Care N. Am.*, 689 F.3d 470, 480 (5th Cir. 2012).

Assuming Dunn's final response controls, then there is no issue.  *But see Gautreaux v. Apache Corp.*, No. 07-5653, 2010 WL 3982279, at *6 (E.D. La. Oct. 8, 2010) (where a witness changes the substance of the testimony via errata sheet, "both the original and amended versions of the changed deposition testimony remain in the record, and the witness must explain the changes to the fact finder").  Regardless, Holstine has not established what was "abnormal" about the results or whether the abnormality indicates defective performance.  During his deposition, Dunn could not explain why the results were recorded as "abnormal," Dunn Dep. [116-14] at 32, but he testified that the "abnormal" results did not mean that the equipment was "not actually functioning," *id*. at 87.  Moreover, Dunn observed the crossing shortly after the accident and noted that the lights and bells were working.  *Id.*  So Dunn's testimony, even as originally given, fails to establish that the crossing lights and bells were not activated at the time of the accident.  Finally, even assuming an issue on this point, causation remains an obstacle. *See infra*.

### d.  Gambrell's Testimony

Steven Gambrell testified that he witnessed the collision while driving a maroon pickup truck northbound on Grand Avenue after exiting a Hampton Inn parking lot south of the crossing. According to him, Cole's truck never stopped moving before the collision, Gambrell Dep. [116-3] at 29–30, 32, the signal lights and bells were not activated before the collision, *id.* at 25, the gates never came down, *id.* at 33, and the locomotive's horn first sounded right before the crash, *id.* at 25.

Assuming Gambrell actually witnessed the collision, his account bears no resemblance to the train's video and other recorded data.  For starters, the video shows that Gambrell was mistaken about whether the gates came down (they did), whether the train's horn sounded more than just a moment before the collision (it did), and whether Cole's truck was stationary as the train approached (it was).  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007) (finding no material dispute when video contradicted party's testimony).  Gambrell's testimony does not create a question of fact regarding the horn, the crossing gates, or whether Cole was moving.

The warning lights and bells present a closer question.  The equipment at the crossing, like the train, had an event data recorder that documented the operation of that machinery.  The data from that recorder shows that the crossing lights had been flashing and the crossing bells had been sounding for 27 seconds before the train reached the crossing.  Dunn Dep. [86-12] at 80–90.  This would be consistent with Dunn's observations and Holstine's news clip (assuming it is admissible).  But an event data recorder is not necessarily conclusive if rebutted with credible evidence. *See Brown v. Nat'l R.R. Passenger Corp.*, No. 3:08cv559KS-MTP, 2011 WL 1130545, at *11–12 (S.D. Miss. Mar. 28, 2011) (holding that fact question existed where various eyewitness accounts conflicted with data from event recorder).  The question is whether Gambrell offers credible evidence. *See Harris*, 550 U.S. at 380.

Even though Gambrell was wrong about every significant, verifiable fact he offered, the Court does not generally weigh his credibility under Rule 56. *See WC & M Enters., Inc.*, 496

13

F.3d at 397.  Instead, the Court looks to the record as a whole, including the train's video, to

determine whether a reasonable juror could believe Gambrell's various statements.  *See Harris*,

550 U.S. at 380.  And with respect to the signal lights and bells, the question focuses on

Gambrell's ability to accurately perceive the events.  For starters, Defendants note that the train's

video fails to show Gambrell's truck near the crossing just before impact.  While true, the

Court's frame-by-frame review of the accident video revealed what could be a vehicle near the

Hampton Inn driving toward the crossing.  Assuming it is Gambrell, the vehicle is not visible as

the train gets closer to the crossing.

The Court has considerable doubt whether Gambrell could have seen the lights or heard

the bells if he was not close enough to be seen in the video.  And the Court further questions

whether a jury could credit Gambrell's testimony that the bells were silent when he failed to hear

the locomotive's horn until just before impact.  Finally, his testimony stands alone in the face of

the event data recorder, Dunn's observations shortly after the accident, and even Holstine's

disputed news footage.  Still, out of caution, the Court will assume without deciding that

Gambrell's testimony is sufficiently credible, though dubious, regarding the lights and the bells.

As discussed later, even assuming a breach of this or other duties, Holstine's claims still fail on

causation.

### 3.    Misuse of Horn

Holstine asserts that Allen either waited until the last seconds to sound the horn or

sounded it too soon using the wrong pattern.  The former theory is singularly supported by

Gambrell's deposition testimony.  But as with other aspects of his testimony, Gambrell cannot

create a material dispute because the evidence from the locomotive video and the train's event

14

data recorder both show that Allen began to sound the horn approximately 20 seconds and 2,203 feet before the collision. Peterson Decl. [86-9] ¶ 8; *see also Harris*, 550 U.S. at 380. The Court therefore grants summary judgment on the theory that Allen delayed sounding the horn.

Holstine's alternative theory is that Allen sounded the horn for too long and with the wrong pattern. In the twenty seconds recorded by the video and the event data recorder, the horn sounded a series of eight blasts: a 2.15 second blast, a 2.12 second blast, a 1.12 second blast, a 4.1 second blast, a 2.2 second blast, a 2.29 second blast, a 1.1 second blast, and a 3.74 second blast that continued through the impact with Cole's truck. Scott Dep. [86-10] at 106–07. Holstine appears to assert that this duration and pattern of horn use violated section 77-9-225 of the Mississippi Code; 49 C.F.R § 222.21; and Illinois Central's Operating Rules.

          a.      Section 77-9-225

Section 77-9-225 requires a railroad company to

> cause the . . . whistle or horn to be blown at the distance of at least three hundred (300) yards [(900 feet)] from the place where the railroad crosses over any public highway or municipal street. The . . . whistle or horn shall be kept blowing at repeated intervals until said crossing is passed.

Miss. Code Ann. § 77-9-225. The undisputed evidence shows that Allen began sounding the horn well before it was 900 feet from the crossing. Any claim based on a violation of section 77-9-225 fails as a matter of law. *See Estate of Bloodworth ex rel. Bloodworth v. Ill. Cent. R.R. Co.*, 129 So. 3d 888, 894 (Miss. 2013).

b.      49 C.F.R. § 222.21

The pertinent federal regulation provides:

(a)  [T]he locomotive horn on the lead locomotive of a train . . . shall be sounded
when such locomotive . . . is approaching a public highway-rail grade crossing.
Sounding of the locomotive horn with two long blasts, one short blast and one
long blast shall be initiated at a location so as to be in accordance with paragraph
(b) of this section and shall be repeated or prolonged until the locomotive
occupies the crossing.  This pattern may be varied as necessary where crossings
are spaced closely together.

(b)  . . . .

    (2)  Except as provided in paragraphs (b)(3) and (d) of this section . . . , the
    locomotive horn shall begin to be sounded at least 15 seconds, but no more
    than 20 seconds, before the locomotive enters the crossing.  It shall not
    constitute a violation of this section if, acting in good faith, a locomotive
    engineer begins sounding the locomotive horn not more than 25 seconds
    before the locomotive enters the crossing, if the locomotive engineer is unable
    to precisely estimate the time of arrival of the train at the crossing for
    whatever reason.

    (3)  Trains . . . traveling at speeds in excess of 60 mph shall not begin
    sounding the horn more than one-quarter mile (1,320 feet) in advance of the
    nearest public highway-rail grade crossing, even if the advance warning
    provided by the locomotive horn will be less than 15 seconds in duration.

Because the horn claim suffers from obvious causation problems, the Court will address

the alleged breaches in summary fashion.  Holstine asserts that the pattern of blasts sounded by

Allen failed to comply with the required long-long-short-long pattern under § 222.21(a) and

violated § 222.21(b)(3).  Having fully considered the parties' submissions, the Court agrees with

Defendants that the alleged failure to sound longer blasts as suggested by Holstine's expert Jim

Scott did not violate § 222.21(a).  *See Byrne v. CSX Transp., Inc.*, No. 3:09cv919, 2012 WL

1965781, at *2 (N.D. Ohio May 31, 2012) (holding that where evidence demonstrated "that each

of the three 'long' blasts were longer than the 'short' blast," the horn pattern complied with 49

16

C.F.R. § 222.21(a)).  The Court likewise agrees that Holstine fails to offer credible evidence that the safe-harbor provision of § 222.21(a) does not apply due to the proximity of the previous crossing to the location of the accident.

c.     Illinois Central's Operating Rules

Holstine asserts that Allen's failure to sound a succession of short sounds when he recognized an emergency situation existed violated Illinois Central's Operating Rules.[4]  He relies on the following excerpt from those rules:

---

[4]Under 49 U.S.C. § 20106(b), a state-law claim that a defendant "has failed to comply with its own plan, rule, or standard that it created" is not preempted.

**410. SOUNDING WHISTLE.** The required whistle signals are illustrated by "o" for short sounds and "‑" for longer sounds:

| SOUND | INDICATION |
|---|---|
| (1)  Succession of short sounds | Use when an emergency exists, or persons or livestock are on or near the track. |
| (2)  — | Air brakes are applied, pressure equalized. |
| (3)  — — | Release brakes and proceed. |
| (4)  o o | Acknowledgement of any signal not otherwise provided for. |
| (5)  o o o | When stopped, back up. |
| (6)  — o | Approaching Roadway Workers or roadway equipment on or near the track, regardless of any whistle prohibition. After the initial warning, sound whistle signal (4) intermittently until the head end of the train has passed the Roadway Workers or equipment. |
| (7)  — — o — | Approaching public crossings with engines leading sound signal as follows: <br>•  At speeds in excess of 60 MPH, start signal at the whistle post, but not more than 1/4 mile before the crossing. <br>•  At speeds of 60 MPH or less, start signal at least 15 seconds but no more than 20 seconds before entering the crossing. |

| | |
|---|---|
| | •  If movement starts less than ¼ mile from the crossing, signal may be sounded less than 15 seconds before entering the crossing when it is seen crossing gates are in the fully lowered position or no traffic is approaching, or traffic is stopped at the crossing. <br>•  Prolong or repeat signal 410 (7) until the crossing(s) is completely covered. |

18

Operating Rules [116-16] at 2–3.

Former Illinois Central and Amtrak employee Michael Scott Wright testified that Rule 410.1, requiring a succession of short bursts in emergency situations, does not apply at public-grade crossings, although he admitted that the rule does not affirmatively state as much.  Wright Dep. [86-22] at 87; Wright Dep. [116-13] at 89.  The Court will assume that Rule 410.1 creates a fact issue as to whether the internal policy required a succession of short blasts in the face of an emergency at a grade crossing.  But again, the horn claim fails for lack of causation.

> ### 4.    Proximate Cause

Even assuming questions of fact regarding the sounding of the locomotive's horn or the maintenance and operation of the crossing lights, bells, and even gates, there remains no evidence that such failures proximately caused the accident.  The Mississippi Supreme Court has "held proximate cause requires the plaintiff to show that the defendant's conduct was the cause in fact and the legal cause of the plaintiff's injury.  Cause in fact means that, but for the defendant's negligence, the injury would not have occurred."  *Huynh v. Phillips*, 95 So. 3d 1259, 1263 (Miss. 2012) (footnote omitted); *see also City of Jackson v. Thornton*, 94 So. 3d 1186, 1194 (Miss. Ct. App. 2011) ("'Cause in fact' means that the act or omission was a substantial factor in bringing about the injury, and without it the harm would not have occurred." (internal quotation marks omitted)).

Defendants assert, and the Court agrees, that "[i]t is rank speculation that Cole would have heeded [the disputed warnings] when he ignored . . . other warnings he was undisputedly provided."  Defs.' Mem. [87] at 24.  For example, the crossing included a stop sign, a stop bar, pavement marking, a "DO NOT STOP ON TRACKS" sign, a crossbuck, and the crossing gates

19

that Cole watched drop after he entered the crossing.  And as for the locomotive's horn, the

parties may dispute the pattern it blew, but there is no dispute that it repeatedly sounded for 20

seconds before impact.  None of these warnings deterred Cole from pulling onto the crossing and

stopping his truck.

Moreover, the approaching locomotive was clearly visible for a considerable stretch

before impact, yet Cole never attempted to pull forward or even exit his truck.  Indeed there was

nothing in front of Cole's truck blocking his egress because the crossing gates were offset

leaving him a clear path to exit the crossing.  *See* Allen Decl. [86-8] at Ex. BA-1.  Notably, there

are no signs from inside the cab that Cole was struggling with the vehicle or was attempting in

any way to avoid the collision.  Looking at the video and the record as a whole, Cole sat

motionless in his truck with his foot on the brake while the train approached.

One obvious conclusion is that Cole took his own life.  Or perhaps he had some other

reason why he stopped his truck squarely across the tracks and never again moved.  But either

way, the parties agree that he was there for at least 12 seconds.  Holstine has not offered any

credible evidence that blinking lights, ringing bells, or a different horn pattern would have made

a difference when Cole seems to have ignored so many other warnings, including the horizontal

gates and the approaching locomotive with its horn blaring.  *See Travis*, 106 So. 3d at 329

("There is no evidence to support the allegation that Michael may not have heard the horn simply

because it may have been blown continuously rather than in intervals."); *Brown*, 2011 WL

1130545, at *8–9 (concluding that plaintiffs failed to adduce evidence that the condition of the

crossing proximately caused the collision and noting that "speculation and conjecture" will not

establish causation).  Defendants are entitled to summary judgment on the horn and warnings-and-signals claims.

C.      Negligent Training

Holstine complains that Defendants failed to provide Allen with appropriate training regarding emergency situations and the legal duties owed to passengers.  Defendants assert that this claim is preempted under 49 U.S.C. § 20106.  Under that section, a state-law claim is preempted if "federal regulations substantially subsume the subject matter of the relevant state law."  *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 664 (1993).  As to the training of locomotive engineers, 49 C.F.R. § 240 "prescribes minimum Federal safety standards for the eligibility, *training*, testing, certification and monitoring of all locomotive engineers to whom it applies."  49 C.F.R. § 240.1 (emphasis added).

Holstine attempts to avoid the preemption argument by noting that state-law claims are not preempted "if there is a violation of a more stringent policy within the company or if there is a violation of a federal standard of care."  Pl.'s Mem. [117] at 27.  But Holstine bases his argument on narrow citations to the depositions that do not account for the full nature of the testimony.  While the record is considered in a light most favorable to Holstine, the Court considers the record as a whole, and concludes that Holstine fails to offer sufficient evidence of any such violations.  The negligent-training claims are preempted.  *See Baker v. BNSF Ry. Co.*, No. 3:09cv787-B, 2010 WL 4063203, at *8 (N.D. Tex. Oct. 13, 2010).

D.      Lost-Wages Claim

Defendants argue that Holstine's claim for lost wages is barred by judicial estoppel.  "The doctrine of judicial estoppel is equitable in nature and can be invoked by a court to prevent a

party from asserting a position in a legal proceeding that is inconsistent with a position taken in a previous proceeding." *Love v. Tyson Foods, Inc.*, 677 F.3d 258, 261 (5th Cir. 2012).

> In determining whether to apply judicial estoppel, we primarily look for the presence of the following criteria:  "(1) the party against whom judicial estoppel is sought has asserted a legal position which is plainly inconsistent with a prior position; (2) a court accepted the prior position; and (3) the party did not act inadvertently."  However, judicial estoppel is not governed by "inflexible prerequisites or an exhaustive formula for determining [its] applicability," and numerous considerations "may inform the doctrine's application in specific factual contexts."

*Id.* (alteration in original) (citation omitted).

Defendants premise their judicial-estoppel argument on Holstine's pre-collision representations to the bankruptcy court in his Chapter 7 bankruptcy case that he was permanently disabled.  Specifically, in a September 7, 2011 hearing before the United States Bankruptcy Court for the Eastern District of Michigan, Holstine testified that he suffered a May 2005 work-related injury that resulted in a March 2009 spinal surgery, after which he did not resume his employment.  Bankr. Tr. [84-4] at 10–11.  He settled a worker's compensation claim related to the injury for a lump-sum settlement representing his lost wages over his remaining work-life expectancy.  *Id.* at 15.  He also testified that in September 2010, he was awarded social security disability on account of a permanent disability:  "[t]hey said they wouldn't be reviewing me until—for five to seven years."  *Id.* at 16.  The bankruptcy court relied on this testimony when it ruled that his worker's compensation award was exempt from his creditors.  *Id.* at 40 ("The debtors' testimony in this case is that the redemption award is to compensate the debtor for—the debtor, Mr. Holstine, for his inability to work for the rest of his life.  This was an actuarial determination . . . about a fair compensation for the loss of future earnings for the rest of his

life."). Defendants argue that Holstine is judicially estopped from now claiming that the collision, which happened just five months after the bankruptcy hearing, caused him to lose future wages that he otherwise would have earned.

The facts of this case present a close call on the judicial-estoppel ruling, so the Court will deny summary judgment at this time without prejudice. The Court is not yet convinced that Holstine has taken plainly inconsistent positions in the bankruptcy court and in this Court; as Holstine points out, he explained to the bankruptcy judge that the Social Security Administration would review his disability status five to seven years after its initial determination. *See Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999) ("Improvement in a totally disabled person's physical condition, while permitting that person to work, will not necessarily or immediately lead the SSA to terminate SSDI benefits. And the nature of an individual's disability may change over time, so that a statement about that disability at the time of an individual's application for SSDI benefits may not reflect an individual's capacities at [a later time]."). Defendants may raise the issue with the Court again at trial.

E.    Punitive-Damages Claim

Finally, Defendants seek summary judgment on Holstine's claim for punitive damages, arguing that their alleged conduct falls short of what is required for such an award. "Punitive damages may not be awarded if the claimant does not prove by clear and convincing evidence that the defendant against whom punitive damages are sought acted with actual malice, gross negligence which evidences a willful, wanton or reckless disregard for the safety of others, or committed actual fraud." Miss. Code Ann. § 11-1-65(1)(a). Here, the only remaining claim is that Allen failed to slow the train quickly enough after realizing that Cole would not move.

There is no argument that Allen was intoxicated, sleeping, or somehow distracted in a way suggesting gross negligence.  Instead, the issue turns on decisions made over the course of a few seconds.  The Court therefore finds no evidence of the requisite scienter under § 11-1-65(1)(c).  The motion for summary judgment is granted on this issue.

IV.     Conclusion

The Court has considered all of the parties' arguments.  Those not specifically addressed would not have changed the outcome.  For the foregoing reasons, Defendants' Motion for Summary Judgment [86] is denied as to the failure-to-slow-or-stop claim and denied without prejudice as to the lost-wages, but otherwise granted.  To the extent the experts' testimony is relevant as to the remaining claim, the Court defers ruling on the *Daubert* Motion to Exclude Testimony of Plaintiff's Proffered Expert Keith Ferguson [90] and the *Daubert* Motion to Exclude the Testimony of Plaintiff's Proffered Expert Jim Scott [92].  The parties can discuss those issues with the Court at the June 17, 2015 pretrial conference.

**SO ORDERED AND ADJUDGED** this the 16th day of June, 2015.

s/ *Daniel P. Jordan III*
UNITED STATES DISTRICT JUDGE

24